

FILED

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

2026 JUN 26  P 3: 16

### Alexandria Division

|  |  |
|---|---|
| WHYTNI H. KERNODLE, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Civil Action No. _ 1:26 cv 1852 |
| v. | ) |
|  | ) JURY TRIAL DEMANDED |
| LOCAL NEWS NOW, LLC d/b/a ARLnow; | ) |
| SCOTT BRODBECK; DANIELL KRAWCZYK; | ) |
| MUNICIPAL CAPTIONING, INC.; | ) |
| MATT de FERRANTI; VALERIE YOUNG; | ) |
| LYNN BORTON; JACKIE STEVEN; | ) |
| ZAKIYA WORTHEY; and the ALLIANCE | ) |
| FOR COMMUNITY MEDIA, | ) |
|  | ) |
| Defendants. | ) |

### COMPLAINT

Plaintiff Whytni H. Kernodle, appearing pro se, alleges as follows.

## I. INTRODUCTION

1.     The Plaintiff is a Black woman, an attorney admitted in California and the District of Columbia, and a journalist. In November 2021 she was hired to revive Arlington Independent Media ("AIM"), Arlington County's public-access media institution, and to rebuild it as a platform for community storytelling, civic education, and government accountability. The organization was failing when she inherited it. She rebuilt it, expanding its programming and its audience. It did not fail under her leadership. It worked.

2.     That is why she was targeted. She had done the one thing the County, the Board, and the community all said they wanted: she had taken a failing public institution and made it work. A faction of former insiders, a county official, a local news outlet, and an industry vendor combined to remove her from AIM, to dismantle the organization she had rebuilt, and to brand her a criminal; to serve their own agendas, they sacrificed not only her but the institution itself and the community it served. They accused her, falsely, of embezzlement, theft, and criminal financial misconduct. They knew it was false. The accusation was the instrument; her removal and her silencing were the object.

3.     The campaign was coordinated, and it followed a method. As the County froze AIM's public-access funding and the organization destabilized, the Defendants reported the destabilization they had caused as evidence of mismanagement rather than as its consequence. They carried the false narrative to County officials and to the press and repeated it until it stuck. The compressed sequence, from the freezing of funds to the Plaintiff's termination, reflects coordination, not coincidence. The Arlington County Board referred the matter to law enforcement; a special prosecutor reviewed it and brought no charges, because the Plaintiff committed no crime. The Defendants said it anyway, and they are saying it still.

4.     A sitting County Board member acknowledged in writing that the treatment of AIM and of the Plaintiff was driven by racial and class bias, and told a witness that speaking up for her would not have mattered because she, too, is Black. A white male leader of a comparable Arlington nonprofit, after an audit that identified concerns at his organization, was permitted to resign on his own terms, his account printed without challenge; the Plaintiff, a Black woman cleared of wrongdoing, was branded a criminal and driven from her profession.

5.    The Plaintiff is a lawyer. She knows the difference between a hard decision and an unlawful one, and she knows what the Defendants did. She brings this action so that they answer for it, under the federal civil-rights laws and the law of Virginia, and she demands a jury.

## II. JURISDICTION AND VENUE

6.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 over the Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983, and supplemental jurisdiction under 28 U.S.C. § 1367 over the related state-law claims, which arise from the same case or controversy.

7.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district and one or more Defendants reside here.

## III. PARTIES

8.    Plaintiff Whytni H. Kernodle is an attorney admitted in California and the District of Columbia and the former Chief Executive Officer of AIM. She resides in Alexandria, Virginia.

9.    Defendant Local News Now, LLC, doing business as ARLnow, is a Virginia limited liability company with its principal place of business in Arlington County, Virginia, where it publishes the news outlet ARLnow.

10.    Defendant Scott Brodbeck is the founder, owner, and publisher of Defendant Local News Now, LLC, sued in his individual capacity for his participation in the conspiracy alleged in Counts II and IV. On information and belief, he holds a Master of Business Administration and operates Local News Now as a commercial network of local news outlets across the region; his interest in AIM and the Plaintiff was competitive and financial, not journalistic.

11.     Defendant Daniell Krawczyk is an individual, the owner of Defendant Municipal Captioning, Inc., and a member and vendor of the Alliance for Community Media.

12.     Defendant Municipal Captioning, Inc. is a North Carolina corporation with its principal office at 214 Muirfield Ridge Drive, Garner, North Carolina, of which Krawczyk is the owner and principal, and for whose conduct within the scope of its business it is vicariously liable. Defendant Jackie Steven is its Managing Director.

13.     Defendant Matt de Ferranti is a member of the Arlington County Board, sued in his individual capacity for statements and conduct outside the scope of any official, legislative function, and, pleaded in the alternative under Federal Rule of Civil Procedure 8(d), under 42 U.S.C. § 1983 for conduct under color of state law as set out in Count VI. He resides in Arlington County, Virginia.

14.     Defendant Valerie Young formerly served as Treasurer of AIM's Board of Directors.

15.     Defendant Lynn Borton is a former President of AIM's Board of Directors.

16.     Defendant Jackie Steven is a former employee of AIM and is now the Managing Director of Defendant Municipal Captioning, Inc.

17.     Defendant Zakiya Worthey formerly served as a County-appointed appointee associated with AIM's Board.

18.     Defendant Alliance for Community Media ("ACM") is a national membership and trade association for community media, of which the Plaintiff was a dues-paying member.

## IV. FACTUAL ALLEGATIONS

### A. The Plaintiff and the relationships the Defendants destroyed.

19.    The Plaintiff is an attorney, a journalist, and a civic leader. In November 2020, Arlington Magazine featured her on its cover as a civil-rights leader. She was recruited in November 2021 to rebuild AIM, an organization the County had hollowed out over years of withheld public-access funding. Her professional reputation is the foundation of her livelihood.

20.    At the time of the Defendants' conduct the Plaintiff held, or was actively pursuing, the following contractual and professional relationships, each of which the Defendants set out to destroy: (a) her written employment agreement as AIM's Chief Executive Officer, effective September 1, 2022, under which her base salary rose to $175,900, together with benefits and bonus eligibility; (b) her continued employment and advancement at AIM; (c) her dues-paying membership contract with the Alliance for Community Media and the benefits and protections of that membership; and (d) prospective and ongoing contracts and engagements for professional speaking, consulting, journalism, nonprofit leadership, and board service, for each of which her professional reputation was a prerequisite.

### B. AIM was financially sound under the Plaintiff.

21.    Under the Plaintiff's leadership AIM was not failing. Its County-facing financial statements, prepared February 20, 2024, reported net revenue of $289,102.43 for the period then ending, on total revenue of $1,106,262 against expenditures of $817,160, more than twelve times the budgeted surplus. AIM's financial statements were prepared by independent certified public accountants, reviewed quarterly by the Board, and presented to the membership.

22.    The accusation that the Plaintiff misused funds or engaged in financial misconduct was false. AIM's former Treasurer and later Board President, who had direct knowledge of AIM's finances, will testify that AIM's financial practices were sound, transparent,

and compliant, that the FY2022 audit was merely delayed during the organization's relocation, and that the allegations against the Plaintiff were false and politically motivated. An Arlington County police officer who reviewed the allegations told that Board President that there was no evidence to support them.

### C. The combination and its purpose.

23.     Beginning no later than 2022 and continuing to the present, the Defendants and others combined and acted in concert to injure the Plaintiff in her reputation, trade, business, and profession and to drive her out of community media. Their shared purpose was to destroy her professional standing and her ability to earn, and thereby to silence her. On information and belief, the accusation of financial mismanagement was a pretext: the insiders' true grievance was that the Plaintiff had redirected AIM's resources away from their preferred priorities and toward the public mission she had been hired to restore, and when she declined to keep funding their interests, they recast lawful budget decisions as misconduct. AIM's former Board President, with direct knowledge, will testify that "beginning in late 2022, a small number of former board members colluded" and "launched a coordinated campaign to discredit the CEO," and that when internal disruption failed, "this group circumvented the Board and took their complaints directly to Arlington County officials and local media, fabricating a narrative of mismanagement that was not supported by facts."

### D. Each Defendant's conduct.

24.     **Jackie Steven.** While an AIM employee, Steven led the internal sabotage of the organization. On or about June 15, 2022, AIM's internet service was disconnected by an unknown caller and its broadcast disrupted. On July 19, 2022, the Plaintiff reported contemporaneously that the disruptions were "because of employee sabotage," that one former employee had "potentially

employed malware" on AIM's system and another had "disconnected our internet," and that "this is being lead by Jackie." Steven thereafter left AIM and became the Managing Director of Defendant Municipal Captioning, a community-media vendor owned by Defendant Krawczyk, and from that position continued to participate in the campaign against the Plaintiff. Steven's object was to reclaim control of an organization that had begun to succeed under the Plaintiff's reforms; she disparaged the Plaintiff publicly, including on social media, as unfit for the role the Plaintiff had in fact revived.

25.    **Lynn Borton.** Borton, a former President of AIM's Board, worked to undermine the Plaintiff's leadership and to defund AIM. Borton's opposition was personal in origin, hardening as the Plaintiff made ordinary management decisions over AIM's personnel and programming that Borton resisted; the governance and financial concerns Borton later voiced, including in the open letter, were a pretext for that animus. On February 21, 2022, she forwarded hostile material concerning a separate litigant to AIM's employment counsel in an effort to feed litigation against AIM. Borton was a leader of the faction that sought the Plaintiff's removal, and she signed the March 14, 2024 open letter described below as "Former AIM Board President."

26.    **Zakiya Worthey.** Worthey, then a County-appointed appointee associated with AIM's Board, turned on the Plaintiff after the Plaintiff refused to let her misuse AIM's resources. In January 2023, the Plaintiff discovered that Worthey was attempting to use AIM's resources to support the political campaign of a person for whom Worthey was working, and the Plaintiff refused; Worthey thereafter became hostile, as the contemporaneous AIM emails reflect. Worthey's antagonism was also personal. The Plaintiff had taken Worthey's daughter on as an intern; Worthey grew more hostile after the Plaintiff addressed the daughter's time-record irregularities and the daughter's refusal to return AIM's laptop. Worthey was, with Borton, among

those working to defund AIM and to remove the Plaintiff. On information and belief, Worthey, Defendant Young, or both repeatedly fed information about the Plaintiff to ARLnow in breach of their fiduciary duties as members of AIM's Board. ARLnow reported the specific terms of the Plaintiff's confidential employment contract, a document held only by the Plaintiff and the members of AIM's Board; the disclosure could have come only from within the Board. That December 2023 disclosure of the Plaintiff's compensation marked the public turn of the campaign against her, drawing hostile commentary aimed at the pay of a Black woman.

27.    **Valerie Young.** Young served as AIM's Treasurer. She participated in the December 2023 campaign attacking the Plaintiff's Form 990 and compensation, and she served as a source for, and was quoted in, the ARLnow article published in December 2023 concerning AIM's Form 990, asserting that the Plaintiff was "lying" and that AIM's financial filing had not been properly reviewed. As Treasurer, Young had access to AIM's financial records and knew, or was reckless in not knowing, that the Form 990 was lawfully filed and certified by AIM's accountants; her fiduciary objection was a pretext for joining the faction's effort to remove the Plaintiff.

28.    **Daniell Krawczyk and Municipal Captioning.** Krawczyk owns Municipal Captioning, a vendor in the community-media field and a vendor of the Alliance for Community Media, for which Defendant Steven serves as Managing Director. At the Alliance's June 2025 national conference, Krawczyk repeated the false accusation that the Plaintiff had "embezzled" from AIM, as set out in Section H below. He made the statement while attending the conference as Municipal Captioning's vendor, in the scope of its business, and the company is vicariously liable for it.

29. **ARLnow.** Local News Now, through ARLnow and its editor and publisher Scott Brodbeck, published a series of articles attacking the Plaintiff, including a December 2023 article questioning her Form 990 and compensation, sourced to former board members, and a February 6, 2025 article amplifying the County audit. ARLnow's actual malice is set out in Section E below.

30. **Matt de Ferranti.** De Ferranti, a member of the Arlington County Board, acted throughout 2023 in his official capacity on the question of AIM's public-access funding, addressing AIM's funding requests as a member of the Board and signing his correspondence as an Arlington County Board Member. He judged AIM's finances without understanding them, fixating on a single invoice and treating it as a reason that AIM's funding could not move forward. County Board member Takis Karantonis described de Ferranti's posture to the Plaintiff in writing: "Matt is not against AIM," he wrote, but "he simply thinks of other constituencies more in line with his priorities and where he expects a higher political yield." After a gala at which Defendant Worthey confronted the Plaintiff, de Ferranti grew less responsive to AIM and aligned himself with the accusers, as Karantonis likewise observed to the Plaintiff at the time. In 2025, in the weeks after the County audit was published, de Ferranti told others that the only reason the Plaintiff had not been jailed or prosecuted was that the County lacked standing to sue her, a statement that falsely imputes the commission of a crime and that was relayed to the Plaintiff. As a Board member, he knew the matter had been referred to a special prosecutor who brought no charges. That statement was not a legislative act; it was a personal accusation made outside any official proceeding, vote, or deliberation, and it is the basis of the Plaintiff's defamation claim against him, while his exercise of official authority over AIM's funding is the basis of her alternative claim under Section 1983.

31. **The Alliance for Community Media.** ACM denied the Plaintiff the protections of her membership and instead moved to protect the white vendor who defamed her at its conference, as set out in Section F below.

32. These actions were coordinated. They were not the independent acts of unconnected persons; they were the overt acts of a combination, taken in concert and in furtherance of the shared purpose described above.

**E. ARLnow published with actual malice.**

33. Before ARLnow published its December 2023 article, the Plaintiff gave ARLnow documentary proof and a written explanation that her Form 990 was accurate and lawfully filed. On August 24, 2023, she provided ARLnow detailed written answers to its questions. On November 30, 2023, she sent ARLnow AIM's 2020 and 2021 Forms 990 for review and explained that the 2021 filing had been delayed by a prior board president's failure to re-engage the accounting firm, a lapse she had since corrected. ARLnow's reporter told her the story would run the following afternoon and asked her to answer the former board members' allegation. On December 4, 2023, at 4:56 p.m., before the article was published, the Plaintiff emailed ARLnow's editor that "our 990 is accurate and complies with the rules," that the filing was certified by a CPA, and that the compensation figure reflected only a two-month employment period, and stated: "I understand that my accusers want the facts to be different but the reality is that they are absolutely incorrect." In that same December 4, 2023 correspondence the Plaintiff also told ARLnow why its sources were not to be trusted: that the accusers were former board members who had improperly disclosed confidential human-resources information from executive sessions; that Defendant Worthey's grievance arose not from AIM's finances but from an HR matter concerning her daughter's internship, which AIM had ended early; and that two of the accusers whom Worthey

held out as County appointees had never in fact been appointed and had no standing. ARLnow thus had specific, detailed reasons to doubt the veracity of its informants, and it published their accusations anyway.

34.     ARLnow had a competitive and financial motive. ARLnow is operated by Local News Now, LLC, which publishes a network of local news outlets across the Washington region and competes in the local-news market in which AIM and the Plaintiff also produced journalism, including WERA news programming and a youth journalism initiative. In August 2023, when the Plaintiff proposed that the two organizations collaborate, Scott Brodbeck declined, writing only that "for various reasons I don't think now is the right time"; ARLnow nonetheless welcomed the Plaintiff as a paying advertiser. On information and belief, ARLnow sought County advertising revenue while targeting AIM, and it published at least fifteen negative articles concerning AIM and the Plaintiff, relying on anonymous former-board-member sources. After publication, ARLnow quietly altered its articles online without printing a retraction, and its February 6, 2025 article amplified the County audit's findings against the Plaintiff.

**F. The open letter and the termination.**

35.     On March 14, 2024, Defendants Borton and Steven, along with fourteen others, signed and published an open letter to the AIM Board and community demanding the "removal of the CEO for failure to perform the duties of the office" and leveling financial accusations against the Plaintiff. The letter asserted that "AIM leadership appears to have misused PEG funds," that "AIM leadership has been reckless in managing its financial obligations," and that members and the public "have been substantially and purposefully misled," and it set figures it called available operating funds of "at best" $453,048 against $622,937 in employee compensation, $671,609 in professional fees, and $106,303 in occupancy and office operations. Those accusations were

misleading and false; the letter faulted the Plaintiff for the absence of an audit since October 2021, a period that predated her hire, and recast lawful expenditures as misconduct. Borton signed as "Former AIM Board President"; Steven signed only as an "AIM Member," concealing that she was the Managing Director of Defendant Municipal Captioning.

36.    Five days later, on March 19, 2024, the Plaintiff was terminated.

### G. The weaponized audit and the official clearance.

37.    The County commissioned a third-party audit and used it to portray the Plaintiff as financially culpable; ARLnow amplified it on February 6, 2025. The audit was conducted, however, without any request to the Plaintiff or to AIM's staff for documentation or explanation of the expenditures it labeled undocumented or unaccounted for. Expenditures go unaccounted for when no one asks those who hold the records to account for them; the audit reached its conclusions without ever seeking the Plaintiff's account, reflecting the same predisposition to blame her that drove the campaign. On February 29, 2024, before the audit was undertaken, the Plaintiff told the County Attorney and the County Manager in writing that, with AIM's staff being laid off, "we will have no employees to assist with the audit so I'm not sure how that will work"; the County conditioned AIM's funding on cooperation with the audit and proceeded to its conclusions regardless. The County's own investigative process, moreover, produced no charges. The matter, referred at the County Board's instance and reviewed by a special prosecutor, ended without prosecution, and the Plaintiff was never charged with any crime. County Board member Karantonis himself characterized the earlier Form 990 attack as "character assassination" by former board members seeking to "damage [the Plaintiff's] reputation and take AIM down with [her]."

### H. The national accusation at the ACM conference.

38.    On June 26, 2025, at the Alliance for Community Media's national conference in Boston, the accusation was carried onto a national stage. Steven Burgoon, AIM's former Chief of Staff, first confronted Defendant Krawczyk after Krawczyk repeated the charge that the Plaintiff had embezzled funds. Alvin Jones, AIM's WERA 96.7 FM station manager and a forty-year media veteran, then had his own confrontation with Krawczyk over the same charge; Jones heard Krawczyk repeat the lie that the Plaintiff had "embezzled" funds from AIM and could not be trusted. The Plaintiff was a dues-paying member of ACM and attended the conference as such. Defendant Jackie Steven, who was also present, separately repeated to attendees the false accusation that the Plaintiff had stolen or embezzled from AIM. Mr. Burgoon and Mr. Jones, along with another individual present at the conference who heard Steven's statement, are witnesses.

**I. ACM's refusal to act and its disparate treatment of the Plaintiff.**

39.    The Plaintiff notified ACM of the defamatory conduct at its conference. ACM took no action to investigate the conduct, to censure Krawczyk or Steven, or to protect the Plaintiff, and afforded her none of the benefits, privileges, or protections of her membership that it would have afforded a similarly situated white member.

40.    ACM's leadership instead moved to protect Krawczyk. ACM's Board President, Jasmine Nykole White, wrote to Krawczyk to reassure him that he need not apologize, characterized his conduct as "passionate," and invoked the importance of preserving ACM's vendor relationship with him. ACM extended its solicitude to Krawczyk, a white vendor, while never once contacting the Plaintiff, a dues-paying Black member publicly accused of a crime at ACM's own conference. On information and belief, after the conference Ms. White conveyed to Steven Burgoon, AIM's former Chief of Staff who had objected to Krawczyk's conduct, a

complaint that a sponsor, understood to be Krawczyk's company, had lodged against Mr. Burgoon; ACM turned its process against those who objected to the lie, not against the man who told it.

### J. Race was the but-for cause.

41.    Race was a but-for cause of the Defendants' conduct toward the Plaintiff. Arlington County Board member Takis Karantonis acknowledged in writing, on July 20, 2023, that the treatment of AIM and of the Plaintiff was driven by "known prejudice and bias (racial, classist... you name it)," that "biases accrue and compound over time," and, on May 15, 2023, that "disgruntled white ex-AIM will blame new AIM for failure." At a March 2024 County Board meeting, Karantonis told a witness that speaking up for the Plaintiff "wouldn't have made a difference" because "you're Black too."

42.    The Defendants' hostility expressed itself in the idiom of racial resentment. Defendant Worthey told the Plaintiff, to her face, that she "thought she was special." County Board member Karantonis, describing the resentment that had hardened against her, used the same words to the Plaintiff and to Alvin Jones. Said of a Black woman who insisted on the equal standing that Arlington reserves, in practice, for its white leaders, the phrase carried its familiar meaning: that she had forgotten her place.

43.    The Plaintiff experienced this campaign as a Black woman, and the discrimination against her does not divide cleanly into race alone. The equal protection she was denied was the protection owed a Black woman; her claim under the Equal Protection Clause rests on race and sex together.

44.    The Defendants understood the racial terrain from the start. During the Plaintiff's hiring, Defendants Borton and Worthey each acknowledged to her that AIM had a problem with race; AIM's then-Treasurer and later Board President witnessed those acknowledgments. That

they could name the problem and then destroy the Black woman hired to confront it does not show good faith; it shows that the acknowledgment was performance. Naming a racial problem is not the same as refraining from racial conduct, least of all where the naming burnished the speakers' standing while their conduct served their interests.

45.    The Plaintiff was not the first Black woman the faction drove from AIM's leadership. On information and belief, Angela Harris, the first Black woman appointed to lead AIM, was forced out within days of her arrival in 2021, and the same entrenched insiders who later moved against the Plaintiff, among them Defendants Borton and Steven, were influential in that result. Two Black women were installed to lead AIM; both were removed by the same hands; no white leader of AIM was forced out in like fashion. A pattern of expelling Black women from the leadership of an institution while sparing white leaders is evidence of racial purpose that no single departure, considered alone, could supply.

46.    A white male leader of a comparable Arlington nonprofit was permitted to step down on his own terms, his own account printed at length and told without challenge, after an audit of his organization recommended improvements to its timekeeping and financial documentation, and amid allegations of sexual harassment by women of color on his staff who said they would resign and sue if he remained; ARLnow never made that audit or those allegations the subject of a story, and he was thereafter hired to lead another Arlington nonprofit. The Plaintiff, a Black woman whom the County's own process cleared of wrongdoing, was instead branded a criminal in repeated press coverage, her written explanations ignored, and driven from her profession.

47.    On December 26, 2023, a member of the AIM community wrote to the Arlington County Manager and the full County Board documenting that the Plaintiff's compensation was

subjected to scrutiny that white nonprofit leaders in Arlington were not, and that ARLnow had edited its articles without retraction. Karantonis acknowledged that the Plaintiff had been "professionally ruined" and that the allegations against her were "largely unfounded and driven by politics."

48.     ARLnow's coverage of the Plaintiff is consistent with a disparity in how it has covered comparable figures of different races, and nowhere is that clearer than in how it treated two nonprofit audits. When an audit of a white nonprofit leader's organization recommended improvements to how it submitted timesheets and documented clients' financial needs, ARLnow mentioned it only in passing, at the end of a favorable article about his departure, and framed it as a routine matter the organization had already addressed. When an audit touched the Plaintiff, a Black woman, ARLnow made it the subject of its own February 6, 2025 article, headlined that it revealed "deeply concerning" issues. The same instrument, a nonprofit audit recommending financial and administrative improvements, was a footnote for the white leader and a scandal for the Black woman. ARLnow's coverage of a Black former member of the County Board followed the same accusatory pattern, in a series of articles concerning his bankruptcy and campaign-finance ethics findings, one headlined that his "scandal is worse than we thought."

**K. The conspiracy and its timeline.**

49.     The Defendants' agreement is shown by the coordinated sequence of their acts: the internal sabotage of AIM in 2022; the December 2023 Form 990 attack carried simultaneously to County officials and to ARLnow; the March 14, 2024 open letter signed by Borton and Steven; the Plaintiff's termination five days later, on March 19, 2024; the County audit and ARLnow's February 6, 2025 amplification of it; Krawczyk's June 2025 statement at the national conference; and the continuing republication of the accusation to the present.

50.    No single Defendant, acting alone, could have inflicted the injury alleged. The campaign required insiders to originate the accusation, Board members and a county official to legitimize and amplify it, a media defendant to publish it, and industry actors to repeat it nationally after the Plaintiff had already been cleared. Each Defendant supplied a part the others could not, and together they accomplished what none could have done alone.

**L. Reach, damages, and silencing.**

51.    The Plaintiff repeatedly deferred her own salary to protect AIM's staff from layoffs. That she, who sacrificed her own pay for her employees, was then accused of stealing from them is itself a measure of the falsity of the charge.

52.    The Defendants' combination cost the Plaintiff her position as AIM's Chief Executive Officer and the $175,900 salary, benefits, and bonus eligibility that came with it; her continued employment; the platform that AIM represented for her work; the benefits of her ACM membership; and prospective and ongoing opportunities for professional speaking, consulting, journalism, future nonprofit leadership, board service, and other contracts, for each of which her reputation was a prerequisite. She has suffered injury to her reputation, severe emotional distress, anxiety, humiliation, and mental anguish, harm to her health and to her family life, and legal expense. The injury has a particular character. The Plaintiff was not undone by strangers; she was undone by people she had worked beside, trusted, and in some instances protected. The board members and colleagues who owed her good faith instead set out to persuade a community that the woman who had deferred her own salary to keep them paid was a thief. To be branded a criminal is one kind of harm; to be branded a criminal by those who were closest to the work, and to watch them repeat it until others believed it, is another, and it is the harm the Plaintiff carries into her health, her marriage, and her home. The false narrative was repeated as recently as the

present and migrated into a separate proceeding concerning the Plaintiff's mother, demonstrating its reach.

53.    The measure of the Defendants' malice is what they were willing to destroy to reach her. To remove one woman, they dismantled a public institution, put its staff out of work, and took its community radio station off the air, leaving the residents it served without it. They accepted that cost. They judged it worth paying.

54.    The accusation continues to be republished. It was repeated at the June 2025 national conference, in an August 30, 2025 reader comment beneath ARLnow's coverage, and to the present, and it continues to cause the Plaintiff ongoing professional harm.

## COUNT I

### Violation of 42 U.S.C. § 1981

(Against Borton, Steven, Worthey, Young, and ACM)

55.    The Plaintiff realleges and incorporates the foregoing paragraphs.

56.    The Plaintiff is a member of a racial minority. Section 1981 guarantees her the same right to make and enforce contracts, and to enjoy all benefits, privileges, terms, and conditions of her contractual relationships, as is enjoyed by white citizens.

57.    The protected relationships are identified above: the Plaintiff's written CEO employment agreement and her continued employment with AIM; her membership contract with ACM; and her prospective professional contracts. Defendants Borton, Worthey, and Young held direct authority over the Plaintiff's employment: they hired her, set and revised the terms of her contract, retained or could remove her, and held custody of the contract document itself. Acting through that authority, and Defendant Steven acting as an AIM employee and thereafter through

Municipal Captioning, they intentionally interfered with and destroyed the Plaintiff's employment and contractual relationship with AIM because of her race. Defendant ACM intentionally denied the Plaintiff the benefits, privileges, and protections of her membership contract, including the enforcement of its own rules, because of her race, while affording those benefits and protections to white members.

58.     Race was a but-for cause of this conduct. The Defendants' proffered reason, financial misconduct, was false, and they knew it was false: AIM was solvent, the Form 990 was lawfully filed, and the County's own referral to a special prosecutor produced no charge. The legitimate explanation having been exposed as pretext, what remained to distinguish the Plaintiff from the white leaders Arlington spared was her race. As a direct and proximate result, the Plaintiff suffered loss of employment, income, professional standing, and opportunity, in an amount to be proven at trial.

## COUNT II

### Statutory Business Conspiracy, Va. Code §§ 18.2-499 and 18.2-500

(Against All Defendants)

59.     The Plaintiff realleges and incorporates the foregoing paragraphs.

60.     Two or more of the Defendants, who are persons and entities of distinct interests and affiliations, combined, associated, agreed, and acted in concert for the purpose of willfully and maliciously injuring the Plaintiff in her reputation, trade, business, and profession, without lawful justification and with legal malice.

61.     In furtherance of the conspiracy the Defendants committed numerous overt acts independent of any defamatory statement, including the internal sabotage of AIM's operations in

2022; the insiders' breach of their fiduciary duties to AIM; the leaking of the Plaintiff's confidential employment and compensation information to ARLnow; the circumvention of AIM's Board to carry the campaign to County officials and the press; and the engineering of the Plaintiff's removal. The Defendants also manufactured and circulated the false accusations that the Plaintiff "stole," was "lying," and had "embezzled," and refused to correct or retract them. The wrongful means of the conspiracy were not limited to speech.

62.    As a direct and proximate result, the Plaintiff suffered injury to her reputation, trade, business, and profession. The Plaintiff is entitled to recover threefold the damages sustained, together with the costs of suit and reasonable attorney's fees, under Va. Code § 18.2-500.

## COUNT III

### Tortious Interference with Contract and Business Expectancy

(Against Borton, Steven, Worthey, Young, de Ferranti, Krawczyk, Municipal Captioning, Inc., and ARLnow)

63.    The Plaintiff realleges and incorporates the foregoing paragraphs.

64.    The Plaintiff had a valid contractual relationship and business expectancies, including her employment as CEO of AIM and her professional relationships and prospects in community media and beyond. The Defendants knew of those relationships and expectancies.

65.    The Defendants intentionally and improperly interfered with those relationships and expectancies by improper methods, including defamation and the dissemination of knowingly false statements. The Defendants who were AIM insiders acted outside the scope of their fiduciary roles and for their own purposes; the remaining Defendants interfered as third parties. The

interference caused the breach or termination of the Plaintiff's relationships and expectancies, and the Plaintiff suffered damages as a result.

## COUNT IV

### Common-Law Civil Conspiracy

(Against All Defendants)

66.     The Plaintiff realleges and incorporates the foregoing paragraphs. Two or more of the Defendants combined to accomplish, by concerted action, the unlawful acts described above, and committed overt acts in furtherance, causing the Plaintiff damage.

## COUNT V

### Defamation and Defamation Per Se

(Against Krawczyk, Municipal Captioning, Inc., Steven, de Ferranti, Young, and ARLnow)

67.     The Plaintiff realleges and incorporates the foregoing paragraphs.

68.     The following are false statements of fact concerning the Plaintiff, each defamatory *per se* because it imputes the commission of a crime and unfitness for her profession: (a) Defendant Krawczyk's statement, on June 26, 2025 at the Alliance for Community Media conference in Boston, that the Plaintiff "embezzled" funds from AIM, for which Defendant Municipal Captioning is vicariously liable; (b) ARLnow's December 2023 assertion that the Plaintiff had not lawfully filed her Form 990, made after ARLnow had been shown that the filing was lawful and certified by AIM's accountants; (c) Defendant Young's statement, published in the December 2023 ARLnow article concerning AIM's Form 990, that the Plaintiff was "lying"; (d) Defendant de Ferranti's statement, in 2025, that the only reason the Plaintiff was not jailed was that the County lacked standing to sue her; and (e) Defendant Steven's statement, in June 2025 at

the Alliance for Community Media conference in Boston, repeating the false accusation that the Plaintiff had stolen or embezzled from AIM, heard by a witness present at the conference.

69.    Each speaking Defendant published the statement to third parties with actual malice, that is, with knowledge of its falsity or reckless disregard for the truth, including in light of the special prosecutor's decision to bring no charges and, as to ARLnow, its documented pre-publication knowledge of the Plaintiff's lawful filing. The Plaintiff is entitled to presumed and actual damages.

## COUNT VI

### Violation of 42 U.S.C. § 1983 (Equal Protection and First Amendment Retaliation)

(Against Matt de Ferranti, in his individual capacity)

70.    The Plaintiff realleges and incorporates the foregoing paragraphs. This Count is pleaded in the alternative, pursuant to Federal Rule of Civil Procedure 8(d), to the Plaintiff's other claims against Defendant de Ferranti.

71.    At all relevant times Defendant de Ferranti was a member of the Arlington County Board with official authority over AIM's public-access funding. To the extent he made the statements and took the actions alleged above in his capacity as a Board member and by invoking the authority of his office, he acted under color of state law.

72.    The Equal Protection Clause of the Fourteenth Amendment secures to the Plaintiff the right to be free from intentional discrimination on the basis of race and sex by persons acting under color of state law. Acting under color of law, Defendant de Ferranti intentionally treated the Plaintiff, a Black woman, differently from similarly situated persons who are not Black women, and her race and sex were a but-for cause of that differential treatment. Because the rights

secured by 42 U.S.C. § 1981 are enforced against a state actor through § 1983, the Plaintiff's rights under § 1981 against Defendant de Ferranti are vindicated through this Count as well.

73.     The First Amendment, applied to the States through the Fourteenth Amendment, protected the Plaintiff's speech as a journalist and as the head of a community-media institution, including her public advocacy to amplify underrepresented voices and her public criticism of the County's withholding of AIM's public-access funding. Acting under color of state law, Defendant de Ferranti took adverse action against the Plaintiff because of that protected speech, including by acting to withhold AIM's funding and by lending the authority of his office to the accusations against her. The adverse action would deter a person of ordinary firmness from continuing to speak, and the Plaintiff's protected speech was a but-for and substantial motivating cause of it.

74.     As a direct and proximate result, the Plaintiff suffered injury to her profession, her standing, her livelihood, and her First Amendment freedoms, in an amount to be proven at trial. The Plaintiff is entitled to compensatory and punitive damages and to reasonable attorney's fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that the Court:

(a) award compensatory damages in an amount to be proven at trial;

(b) treble the damages awarded under Count II pursuant to Va. Code § 18.2-500;

(c) award punitive damages;

(d) award reasonable attorney's fees and costs under 42 U.S.C. § 1988 and Va. Code § 18.2-500;

(e) upon a finding of liability, enter a permanent injunction restraining the Defendants from continued concerted interference with the Plaintiff's business and professional relationships and from republishing the statements adjudged false, the Defendants having continued to republish the accusation and to cause the Plaintiff ongoing professional harm; and

(f) grant such further relief as is just.

**JURY TRIAL DEMANDED on all issues so triable.**

Respectfully submitted,

Whytni H. Kernodle, pro se
1685 Hunting Creek Drive
Alexandria, Virginia 22314
whytni.kernodle@gmail.com  |  (310) 963-2585

Dated: June *16*, 2026.